IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM E. PEASE <br> Serve: 2602 Fernleaf Road <br> Charlottesville, VA 22911 <br><br> Defendant. | ) ) ) ) ) ) ) Civil Action No.: _____ ) ) ) ) ) ) ) |

## COMPLAINT

Plaintiff Mutual of Omaha Insurance Company ("Mutual of Omaha," the "Company," or "Plaintiff"), by counsel, states as follows for its Complaint against plaintiff William E. Pease ("Pease" or "Defendant").

### NATURE OF ACTION

1.  This is an action for declaratory judgment and rescission of contract. Specifically, when applying for a Critical Illness Indemnity Insurance policy (the "Policy") issued by Mutual of Omaha, Pease falsely and fraudulently stated he (i) had not previously received any medical care for eye problems, and (ii) within the 10 years prior to the time of his application, had not been treated for, or had any known indication of, eye problems. In truth, Pease, who is forty-six years old, was diagnosed with macular degeneration (an eye disease that causes the progressive deterioration of visual acuity) when he was fourteen years old and has suffered from its effects since that time. Indeed, just two years prior to the time he completed his application, Pease specifically sought out an eye specialist to provide him ongoing medical care for his macular degeneration. Pease's eye problems were nowhere disclosed to Mutual of Omaha.

2. In late 2009, Pease filed a claim for Critical Illness benefits based on "Blindness" (as that term is defined in the Policy). His claim was based on deteriorating visual acuity due to macular degeneration. The benefit sought was $250,000. As a result of the claim, Mutual of Omaha learned *for the very first time* that Pease, despite being asked direct and specific questions about prior eye disorders, had failed to disclose both his prior diagnosis of macular degeneration and his recent consult for the same. Had Pease disclosed these matters, Mutual of Omaha would not have issued the Policy on the terms that it did. Instead, it would have issued a "Critical Illness" insurance policy which contained a specific exclusion for blindness. Now, faced with a claim for $250,000 based on a fraudulently obtained policy, Mutual of Omaha files this action seeking a declaratory judgment that (i) the Policy was fraudulently obtained; (ii) as such, the Policy can be, and is, rescinded and deemed void *ab initio*, and (iii) it has no obligations whatsoever to Pease under the Policy.

**PARTIES**

3. Mutual of Omaha is a corporation organized under the laws of Nebraska and qualified to do business in the Commonwealth of Virginia. Mutual of Omaha's principal place of business is in Omaha, Nebraska.

4. Upon information and belief, Pease is a resident of Charlottesville, Virginia and a citizen of the Commonwealth of Virginia.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction pursuant to the "diversity" provisions of 28 U.S.C. § 1332. Specifically, Mutual of Omaha is a citizen of Nebraska and Pease is a citizen of Virginia. The parties are thus fully diverse for purposes of invoking federal diversity jurisdiction and the amount in controversy exceeds $75,000.

6. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claims herein occurred.

## FACTUAL BACKGROUND

**A.  Pease Applies For, And Purchases, The Policy**

7. In or around September 2007, Pease purchased the Policy. A true and accurate copy of the Policy is attached as **Exhibit A**.

8. The Policy was issued after Pease completed a multi-step application process. Such steps included: (i) completing a written application; (ii) participating in a telephone interview; and (iii) submitting to an in-person examination.

9. Regarding the application step, Pease completed his written application on August 1, 2007. A true and accurate (albeit redacted) copy of the application is attached hereto as **Exhibit B**.

10. Among other things, the application asks: "Has any person proposed for Insurance *ever* received *medical care for or had* the following conditions: . . . [an] *Eye or Ear Disorder*." *Id.* (emphasis added). Pease checked the "None of These" box in response to this question.

11. In addition, the last page of the application contains a section titled "Agreements." In relevant part, this section states:

> I/We, the undersigned, and the undersigned Producer(s), agree that (a) all answers in this application are true and complete and Mutual of Omaha Insurance Company will rely upon these answers to determine insurability, and (b) incorrect or misleading answers may void this application and any certificate issued from its effective date.
> . . .
> **Fraud Warning** – Any person who knowingly and with intent to defraud any insurance company or any other person files an application for insurance or statement of claim containing any

3

>materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Exhibit B** (bold print in original).

11.   Pease specifically signed this page of the application, directly below language that also said: "**I/We have read and understand this Agreement Section and any receipt provided, and I/we approve all the answers as recorded on this application**." *Id.* (bold print in original).

12.   Pease completed the next step of the process (the telephone interview) on August 15, 2007. At that time, Pease spoke with a Mutual of Omaha representative and said that he had "no health concerns" of consequence and that his most recent medical treatment was his annual physical with a Charlottesville physician named Dr. James McKnight.

13.   Pease undertook the final step (the in-person physical examination) of the process on September 10, 2007. As part of that step, Pease completed a form entitled "Statements to Examiner" where he specifically checked the "No" box next to the following question: "Within the last 10 years, have you *been treated for* or *had any known indication of*: . . [a] Disorder of the *eyes*, ears, nose or throat?" *Id.* (emphasis added). A true and accurate (albeit redacted) copy of that form is attached hereto as **Exhibit C**.

14.   On the same page of that document, and directly above Pease's signature, were the following words: "I agree that these statements are a *part of my application* and that all statements and answers: (a) *are complete and true* to the best of my knowledge and belief; and (b) *will be relied on to determine my insurability*." *Id.* (emphasis added).

15.   On the basis of these and other similar representations, Mutual of Omaha approved Pease for the Policy and issued it with an effective date of August 1, 2007.

4

**B.     The Key Terms Of The Policy**

      **a.     Critical Illness Terms**

16.     The Policy is a "Critical Illness Indemnity Insurance Policy." In this regard, it provides special protection to persons who become diagnosed with certain "critical" illnesses, such as Alzheimer's Disease, Paralysis, Deafness, or Multiple Sclerosis.

17.     Among the critical illnesses covered by the Policy is "Blindness." Under the Policy, "Blindness" is defined as:

> . . . the permanent and uncorrectable loss of sight in both eyes. In order for the Diagnosis of Blindness to be covered under this certificate, the Insured's corrected visual acuity must be worse than 20/200 in both eyes, or the Insured's field of vision must be less than 20 degrees in both eyes. Diagnosis must be made by a Legally Qualified Physician.

**Exhibit A**, p. 2.

18.     If the insured becomes diagnosed with one of the critical illnesses under the policy and does so prior to turning age 65, he is entitled to the full indemnity amount under the Policy, which is $250,000.

19.     Relevant here, barring certain unusual circumstances (such as fraud), if Pease becomes diagnosed with visual acuity worse than 20/200 in both eyes after August 1, 2007 and before his 65th birthday, he would be entitled to a lump-sum payment of $250,000.

      **b.     The "Please Read The Application Provision"**

20.     The Policy also attaches and refers back to the insured's initial application. In doing so, in a section titled "Pease Read The Application," the Policy expressly tells the insured that he has an obligation to be full, complete, and truthful about his answers on the application.

21. In relevant part, the "Pease Read The Application" provision states:

> Please read the attached copy of the application immediately. If anything in it is not correct or if any *past medical history has been left out*, the Owner and the Insured should tell Us. *This certificate was issued on the basis that all information in the application is correct and complete. If not, this certificate may not be valid.*

**Exhibit A**, p.1 (emphasis added).

22. At the top of the same page that contains the "Please Read The Application" provision, the Policy also says: "The premium paid, the *completed application*, and *Our reliance on Your answers to the application questions* have put this certificate in force as of the Certificate Issue Date . . . A copy of the application is attached." *Id.* (emphasis added).

### c.    The Non-Contestability Provision

23. A final relevant provision is the Policy's non-contestability clause. According to this provision, generalized misstatements in the application which are discovered after the Policy has been in force for two years have no effect on the validity of the policy. *Fraudulent* misstatements, however, may be used in order to void and invalidate the Policy.

24. In relevant part, the non-contestability provision states:

> TIME LIMIT ON CERTAIN DEFENSES – After this certificate has been in force for a period of two years during the Insured's lifetime, We cannot use misstatements, *except fraudulent misstatements in the application*, to void the coverage or deny a claim for loss that happens after the two-year period.
>
> After this certificate has been in force a period of two years after the date of reinstatement and during the Insured's lifetime, We cannot use misstatements, *except fraudulent misstatements*, in the reinstatement application to void the coverage or to reduce or deny a claim which would otherwise be covered.

**Exhibit A**, p. 7 (emphasis added).

**D.     Pease Files A Claim For Critical Illness Benefits Based On "Blindness"**

25.     In December 2009 – *more than two years after the Policy had been in force* – Pease contacted Mutual of Omaha to make a claim for Critical Illness benefits under the Policy.  His claim was based on Blindness, and he told the Company representative he was now "legally blind."  Mutual of Omaha provided Pease with the necessary forms and advised him to complete them and return them to the Company.

26.     In February 2010, Pease returned the completed forms.  Included among them were (i) a "Claimant's Statement" form, which was completed by Pease, and (ii) a "Physician's Report" form, which was completed by Dr. Paul Yates, an ophthalmologist in Charlottesville.  A true and accurate (albeit redacted) copy of the "Claimant's Statement" form is attached hereto as **Exhibit D** and a true and accurate (albeit redacted) copy of the "Physician's Report" form is attached hereto as **Exhibit E**.

27.     In the "Claimant's Statement," Pease wrote that the nature of his Critical Illness was "Macular degeneration" and "stargardts."   He said that was first diagnosed with these conditions on July 1, 2008 and that he first consulted a medical practitioner in connection with these conditions on that same date.

28.     In the "Physician's Report," Dr. Yates diagnosed Pease with "Stargardts/ Macular Degeneration" and said that Pease's corrected vision in each eye was only 20/200.  Dr. Yates noted that Pease had first consulted him about his vision problems on July 1, 2008, but wrote that Pease had been aware of his eye problems and/or suffered from eye problems "since age 14."

29.     Indeed, upon information and belief, Stargardts is commonly known as "Juvenile Macular Degeneration" and its symptoms usually appear in childhood.  Generally

7

speaking, the condition results is a rapid reduction in visual acuity at that time (usually between the ages of six and twelve), followed by a plateau. Visual acuity thereafter usually remains stable until later in adulthood (e.g., over the age of fifty), when it starts to noticeably decline, often to the point of legal blindness.

30.     Together with these forms, Pease also submitted medical records from Dr. Yates, most of which were dated July 1, 2008. True and accurate (albeit redacted) copies of certain of those records are attached as **Exhibit F**.

31.     In his records, Dr. Yates indicated that Pease's visual acuity with correction *as of July 1, 2008* was 20/200 in each eye. He also signed a record dated April 15, 2009 which contained the same diagnosis.

32.     Dr. Yates' records, however, also showed that:

- Pease had a "history of AMD [macular degeneration] since 14";
- Pease had had reduced visual acuity "since childhood";
- Glasses did not help Pease and that he "cannot see details";
- Pease had heard good things about "Genetech"
- Pease was told as of 07/01/08 that he could not drive with his current vision and that he "voice[d] understanding of this"; and
- Dr. Yates informed the Virginia Department For The Blind & Vision Impaired of Pease's reduced visual acuity by fax on 04/15/09

**E.   Mutual Of Omaha Investigates Pease's Claim And Discovers That Pease Has Suffered From Macular Degeneration Since Childhood *And* That He Had Sought Care For This Condition As Recent As *2005***

33.     In analyzing the above forms and medical records, Mutual of Omaha advised Pease that it was "concerned about Policy validity." Indeed, in late May, 2010, a Company representative specifically told Pease: "Yours is a condition that has existed since your childhood and you did not disclose it on your application for coverage."

8

34. Mutual of Omaha's concerns were validated in July 2010, when it received medical records from Dr. John MacKnight, the doctor who had been previously identified by Pease as his primary treating physician. True and accurate (albeit redacted) copies of certain of those records are attached hereto as **Exhibit G**.

35. In a June 8, 2005 record, Dr. MacKnight noted that Pease had come into his office seeking to "establish[] a primary care relationship" and had two specific concerns:

> One is with respect to obtaining ophthalmologic follow-up for a *previously diagnosed* macular degeneration. The other is with respect to management of persistent and progressive heel pain relating to significant skin changes in that area.

**Exhibit G** (emphasis added).

36. In that same record, Dr. MacKnight noted that Pease's "past medical history is notable for macular degeneration *diagnosed as a teenager*" and made a specific diagnostic notation of "macular degeneration." *Id.* He then said would he refer Pease to "either Dr. Conway or Dr. Tiedman," both of whom, at the time, upon information and belief, were local ophthalmologists in Charlottesville.

37. Similarly, in a medical record from a September 14, 2005 visit, Dr. MacKnight specifically listed "macular degeneration" under the heading "PROBLEM LIST." *Id.*

**F.   Mutual of Omaha Would Not Have Issued The Policy As It Was Written To Pease Had It Known About His Prior Diagnosis For Macular Degeneration Or His Recent Treatment For Eye Problems**

38. Upon receiving and reviewing all of these items, Mutual of Omaha realized it had been defrauded with respect to the Policy. Specifically, Mutual of Omaha concluded that, upon information and belief, Pease had intentionally, knowingly, and willfully lied about his prior macular degeneration diagnosis and that, as well, he had intentionally withheld information about all of his prior medical treatment, consults, and care for that condition.

9

39. Information about Pease's diagnosis of macular degeneration and his prior consult and care for his eyes was material to the issuance of the Policy and its terms contained therein. Specifically, after learning of Pease's fraud, Mutual of Omaha determined, based on its underwriting guidelines, that if Pease had properly disclosed that he had been previously diagnosed with macular degeneration as part of his application for the Policy and had properly disclosed his recent medical consult for his eyes, it would not have issued the Policy as it was then written. Instead, it would have issued "Critical Illness" coverage with an exclusion for blindness. In other words, Mutual of Omaha would not have assumed the risk for precisely the type of claim that Pease is now making.

40. Mutual of Omaha now seeks a legal determination of its rights and obligations under the Policy, particularly on the matter of rescission, based upon Pease's false and fraudulent misrepresentations about his prior diagnosis of macular degeneration and his prior medical treatment and consult for this condition.

41. In connection with the filing of this lawsuit, Mutual of Omaha is separately sending a letter to Pease advising him that Mutual of Omaha considers the Policy rescinded and refunding all of his premiums under the Policy.

**COUNT I:**
**DECLARATION OF RIGHTS AS TO RESCISSION**

42. The allegations of paragraphs 1-41 are realleged as if fully set forth herein.

43. Pease's representations, omissions, and statements described herein about his prior macular degeneration diagnosis and his medical treatment, consult and care regarding his eyes were false and untrue.

44. Pease's misrepresentations, omissions, and false statements described herein about his prior macular degeneration diagnosis and his medical treatment, consult, and care

regarding his eyes were made fraudulently, intentionally, knowingly, willfully, and with intent to mislead Mutual of Omaha in order to obtain the Policy.

45. Pease's misrepresentations, omissions, and false statements described herein about his macular degeneration diagnosis and his medical treatment, consult, and care regarding his eyes materially affected the acceptance of the risk and hazard assumed by Mutual of Omaha. Had Pease had properly disclosed that he had been diagnosed with macular degeneration as part of his application for the Policy and that he had received a recent consult for his eyes, Mutual of Omaha would not have issued the Policy as it was then-written and instead would have issued the policy with an exclusion for blindness.

46. Based on the above, Mutual of Omaha has the right to rescind Pease's coverage under the Policy.

## COUNT II:
## RESCISSION (VA. CODE § 38.2-309)

47. The allegations of paragraphs 1-41 are realleged as if fully set forth herein.

48. Pease's representations, omissions, and statements described herein about his prior macular degeneration diagnosis and his medical treatment, consult, and care regarding his eyes were false and untrue.

49. Pease's misrepresentations, omissions, and false statements described herein about his prior macular degeneration diagnosis and his medical treatment, consult, and care regarding his eyes were made fraudulently, intentionally, knowingly, willfully, and with intent to mislead Mutual of Omaha in order to obtain the Policy.

50. Pease's misrepresentations, omissions, and false statements described herein about his macular degeneration diagnosis and his medical treatment, consult, and care regarding his eyes materially affected the acceptance of the risk and hazard assumed by Mutual of Omaha.

Had Pease had properly disclosed that he had been diagnosed with macular degeneration as part of his application for the Policy and that he had received recent care for his eyes, Mutual of Omaha would not have issued the Policy as it was then-written and instead would have issued the policy with an exclusion for blindness.

51. Based on the above, Mutual of Omaha satisfies the requirements of both Virginia Code § 38.2-309 and the Policy for purposes of rescinding the Policy and thus has the right to rescind the Policy.

WHEREFORE, the Mutual of Omaha Insurance Company respectfully and specifically requests the following relief against William E. Pease:

(a) an Order declaring and adjudicating the rights and liabilities of the parties under the Policy;

(b) an Order declaring that Pease knowingly, intentionally, and willfully made misrepresentations to Mutual of Omaha about his prior diagnosis for macular degeneration and his treatment, consult, and medical care for his eyes and that such misrepresentations were made with the intent to mislead Mutual of Omaha

(c) an Order declaring that Pease's misrepresentations were material to the acceptance of the risk and hazard assumed by Mutual of Omaha under the Policy;

(d) an Order declaring that Mutual of Omaha has the right to rescind the Policy based on Pease's fraudulent misrepresentations;

(e) an Order declaring that the Policy is rescinded and void *ab initio* and that as such, Mutual of Omaha has no obligations under the Policy;

(f) Such other and further relief as to the Court seems just, proper, and equitable; and

(g) Associated expenses and costs related to this action.

Respectfully submitted,

MUTUAL OF OMAHA INSURANCE COMPANY

By\_\_\_\_/s/ Richard F. Hawkins, III_____
Of Counsel

Richard F. Hawkins, III (VSB #40666)
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 23220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)

Counsel for Plaintiff